UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| ANNASTACIA B. ALALADE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:09-CV-338-PPS |
| | ) | |
| AWS ASSISTANCE CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Plaintiff Annastacia Alalade brought this action against her former employer, defendant AWS Assistance Corp., alleging sexual harassment and retaliatory termination, both in violation of Title VII, and an Indiana state law claim for negligent retention [DE 23]. This matter is now before the Court on AWS's motion for summary judgment [DE 30], which, for the reasons discussed below, is **DENIED**.

## FACTUAL BACKGROUND

Alalade began working at AWS in October 2006 as a group home trainer at the Ireland Ridge Group Home, which is one of a number of group homes that AWS operates in South Bend, Indiana [DE 23, ¶ 10; DE 30-1 at 3-4]. Her duties included feeding and giving medication to Ireland Ridge's residents, who suffer from various medical and other disabilities [DE 30-1 at 4]. In early 2008, Samuel Ntawanda was the residential manager at Ireland Ridge and Alalade's direct supervisor [DE 33-1 at 4-5].

On January 21, 2008, Ntawanda sexually assaulted Alalade while she was getting juice for a resident [DE 30-1 at 5 & 9]. Alalade alleges that Ntawanda approached her from behind, pushed her against a wall, unzipped his pants and removed his belt [DE 30-1 at 9-11]. She

further alleges that Ntawanda kissed her, forcefully placed his hands on her breasts and genitals, and exposed his genitals to her [*Id*.]. Alalade fought back, eventually managing to push Ntawanda away; she then ran into a bathroom and locked the door behind her [*Id*. at 11].

AWS concedes that the incident with Ntawanda was serious [DE 31 at 12]. But it downplays its significance, in part by contending incorrectly that Alalade estimates that the "the entire incident was over in one minute" [*Id*. at 3].[1] And AWS flatly denies that the incident rose to the level of seriousness needed to create an actionable hostile work environment [*Id*. at 12].

Days after the incident, on January 25, 2008, Alalade submitted a written complaint to AWS [DE 30-1 at 14-15], and filed a contemporaneous report with the police [DE 23, ¶ 15]. She did not work with Ntawanda again [DE 30-1 at 20]. And Ntawanda was later terminated for the incident [DE 30-2 at 2-3]. The record before the Court could be clearer as to the date of Ntawanda's termination, but it appears this occurred in early February 2008, shortly after Alalade submitted her written complaint [DE 33-3 at 10].

Peggie Ncube became Alalade's supervisor after Ntawanda's termination [DE 30-2 at 3; DE 33-3 at 6]. Immediately thereafter, Ncube, who was a friend of Ntawanda's and belonged to his church, began to berate Alalade, on a daily basis, including by criticizing her clothing as too tight and criticizing Alalade for being sexually provocative [DE 30-1 at 25 & 27-29; DE 33-3 at

---

[1]In support of this claim, AWS cites to Alalade's deposition transcript, which shows that what Alalade actually said was that the incident lasted for *longer* than a minute:

Q: Was [the assault] just over a couple of minutes, or was it longer than that?

A: It was over a minute.

[DE 30-1 at 12, ln. 20-22.]

7]. When co-workers were present, Ncube would take Alalade into the bathroom to criticize her [*Id.*]. Ncube also blamed Alalade for complaining about Ntawanda, and told Alalade that Ntawanda's conduct was her own fault [DE 33-3 at 7]. In essence, Ncube was blaming Alalade for the sexual assault committed on her by Ntawanda.

One such incident between Alalade and Ncube occurred on June 12, 2008, when Ncube took Alalade into the bathroom to "downgrade" her for her attire [DE 30-1 at 27]. On this occasion, Ncube asked Joan Reifel to join her and Alalade in the bathroom [*Id.*]. Reifel, who AWS hired as a residential manager [DE 30-2 at 3], agreed with Ncube that Alalade's clothing was inappropriate, and added that her husband would not dress her like that [DE 30-1 at 28].

Shortly thereafter, on June 18, 2008, Reifel, in consultation with Ncube, completed a written employee performance appraisal for Alalade, remarking that Alalade could improve with more modest clothing and less gossip [DE 30-3 at 1-5]. AWS, however, did not take any formal disciplinary action against Alalade as a result of the appraisal, including by not adjusting her pay, benefits or responsibilities [DE 30-1 at 26-27].

On June 19, 2008, Alalade filed a charge of discrimination with the EEOC and the South Bend Human Rights Commission, alleging sex discrimination and retaliation [DE 33-3 at 10; DE 30-1 at 31, Ex. A].

By December 2009, Alalade had a new supervisor, Angela Small [DE 30-4 at 2]. During this time, Alalade, and Dorothy Njiru, another group home trainer, were responsible for weighing patients, and recording those weights [DE 30-4 at 8-11]. Small learned from another AWS nurse that discrepancies were appearing in the patient weight records that Alalade and Njiru had prepared [DE 34 at 4-7]. As it turned out, the scales Alalade and Njiru were supposed

3

to have been using to weigh the patients were broken [*Id.*]. Evidently, Alalade and Njiru were just guessing at the patients weight and writing phony numbers into the patients' records. When this was all brought to the attention of Kim Bolen, AWS's residential director, Bolen prepared a disciplinary report on Alalade concerning this incident, in which she recommended that Alalade be terminated [DE 30-1 at 49, Ex. O]. Alalade and Njiru were both terminated on January 15, 2010 [*Id.* at 50, Ex. O; DE 31 at 9].

On January 30, 2010, Alalade filed a second charge of discrimination with the EEOC, this time alleging that AWS's January 15, 2010 termination of her was in retaliation for her filing the initial charge of discrimination on June 30, 2008 [DE 31 at 10]. Despite this allegation, it appears that Alalade has now abandoned this theory because nowhere in her briefing does she rely on her termination as the materially adverse action needed to prove retaliation.

Instead, her Title VII retaliation claim is based on the theory that Ncube's conduct, including the June 18, 2008 negative performance appraisal that Reifel completed in consultation with Ncube, was in retaliation for her complaint about Ntawanda's conduct [*Id.* at 11-15]. As for her sexual harassment claim, it is based on the theory that Ntawanda's original sexual assault against her was conduct in and of itself serious enough to have created a hostile work environment for her [DE 33 at 7-8]. Alalade also asserts an Indiana state law claim for negligent retention, based on her allegation that AWS was aware of prior reports that Ntawanda has engaged in sexually harassing behavior, before AWS hired him [DE 23, ¶¶ 33-36].

To attempt to defeat the retaliation claim, AWS argues that the poor written performance appraisal does not constitute a materially adverse employment action, which Alalade must show

4

to succeed on this claim. Moreover, AWS argues that Alalade cannot show a causal connection between her complaints about Ntawanda's conduct and her negative performance appraisal.

As to the sexual harassment claim, AWS argues that Ntawanda's conduct was an isolated event, and thus not sufficient to create the hostile work environment Alalade must establish to sustain her claim. AWS further argues that, even if Alalade could establish a hostile work environment, it is still entitled to the *Ellerth/Faragher* affirmative defense, which a defendant employer can assert where, as here, the plaintiff employee suffered no tangible employment action.

AWS does not address Alalade's negligent retention claim in its opening brief. On reply, however, it argues that this claim fails because Alalade has no evidence that AWS had any knowledge of Ntawanda's propensity for misconduct. Because this argument was raised for the first time on reply, AWS has waived it, and I will therefore not rule on it. *See Wildlife Express Corp. v. Carol Wright Sales, Inc*., 18 F.3d 502, 508 n.5 (7th Cir. 1994) (argument first raised in reply brief is waived); *Graff v. City of Chicago*, 9 F.3d 1309, 1318 n.6 (7th Cir. 1993) (same); *Anderson v. Astrue*, No. 1:09-CV-00327, 2010 WL 3522574, at * 9 n.7 (N.D. Ind. Aug. 31, 2010) (same).

**DISCUSSION**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56©. The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley*

*& Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

In resolving a motion for summary judgment, I must draw every reasonable inference from the record in the light most favorable to the non-moving party. *Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 497 (7th Cir. 1999). The non-moving party must support its contentions with admissible evidence and may not rest upon mere allegations in the pleadings or conclusory statements in affidavits. *Celotex*, 477 U.S. at 324. The plain language of Rule 56 mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to its case and on which that party will bear the burden of proof at trial. The production of only a scintilla of evidence will not suffice to oppose a motion for summary judgment. *Anderson*, 477 U.S. at 252.

## I. Alalade's Retaliation Claim

Title VII prohibits an employer from discriminating against an employee because she has opposed a practice that Title VII has made "an unlawful employment practice," or because she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. *See* 42 U.S.C. § 2000e-3(a).

A Title VII plaintiff can prove retaliation using either the direct or indirect, *McDonnell Douglas*, method of proof. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 784 (7th Cir.

2007). Alalade defends her retaliation claim solely in terms of the direct method of proof, arguing that there is a causal link between her complaints about Ntawanda's conduct and Ncube's subsequent treatment of her.

To prove retaliation under the direct method, a plaintiff must offer evidence that: (1) she engaged in a statutorily protected activity; (2) the defendant subjected her to an adverse employment action; and (3) a causal connection exists between the two events. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008) (citing *Treadwell v. Office of Ill. Sec'y of State*, 455 F.3d 778, 781 (7th Cir. 2006)). Alalade easily meets the first element of this test: it is beyond dispute that Alalade's complaint to AWS, and concurrent police report, about Ntawanda's conduct were statutorily protected activities.

So the issues to be resolved on summary judgment concern the other two prongs of the direct method. As to the second element, I find that a fact dispute exists as to whether Ncube's conduct toward Alalade constitutes an actionable adverse job consequence. As to the third element, I find that Alalade has presented enough evidence of a causal connection between Alalade's complaints about Ntawanda and Ncube's subsequent conduct to survive summary judgment.

**A.     Materially Adverse Employment Action**

AWS argues that neither the June 18, 2008 negative performance appraisal, nor Ncube's conduct toward Alalade, constitutes a materially adverse employment action for Title VII purposes. I disagree.

To be actionable, an adverse job action "must materially alter the terms and conditions of employment." *Stutler v. Ill. Dept. of Corr.*, 263 F.3d 698, 703 (7th Cir. 2001). But this does not

limit adverse job actions "solely to loss or reduction of pay or monetary benefits." *Whittaker v. Northern Illinois Univ.*, 424 F.3d 640, 647-48 (7th Cir. 2005). In *Burlington Northern and Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006), the Supreme Court defined materially adverse employment actions quite broadly, requiring a fact-intensive analysis of "a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." 548 U.S. at 68 (quotation marks and citation omitted); *see also Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) ("Many people find music soothing and welcome its addition to the workplace. But if an employer sought to retaliate for a charge of discrimination by exploiting this vulnerability, moving him from a quiet office to one where Muzak plays constantly, that could be a material change"); *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). Indeed, employer conduct actionable as retaliation does not even require an actual employment action. *See Johnson v. Cambridge Indus., Inc*., 325 F.3d 892, 902 (7th Cir. 2003) ("In the retaliation context, we have explained that the adverse action or harm that an employee suffers will not always be employment-related."); *Herrnreiter v. Chicago Housing Auth*., 315 F.3d 742, 744-45 (7th Cir. 2002) ("We do not mean to suggest . . . that retaliation, . . . has to involve an adverse employment action. It does not.").

In short, under *Burlington Northern*, whether an adverse action is *material* for purposes of Title VII's anti-retaliation provision is a matter of whether it would deter a reasonable employee from engaging in the protected activity. *Burlington Northern,* 548 U.S. at 69; *Lewis v. City of Chicago,* 496 F.3d 645, 655 (7th Cir. 2007) ("the challenged action must be one that a reasonable employee would find to be materially adverse such that the employee would be

8

dissuaded from engaging in the protected activity") (quotation marks and citation omitted); *Roney v. Illinois Dep't of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007) (same).

Alalade's negative performance evaluation, alone, may be enough to constitute a materially adverse employment action under this standard. Indeed, a recent Seventh Circuit case holds that "a negative performance evaluation could constitute an adverse action within the meaning of the direct method of proving retaliation." *Silverman v. Board of Educ. of City of Chicago*, No. 10-2977, --- F.3d ----, 2011 WL 941518, at *9 (7th Cir. Mar. 21, 2011).

To be sure, there are a number of Seventh Circuit cases that find that a negative performance review, standing on its own, will not satisfy the adverse action element of a retaliation claim, where, as here, no tangible job consequences followed from the negative performance evaluation. *See Whittaker*, 424 F.3d at 646; *Longstreet v. Illinois Dep't of Corr.*, 276 F.3d 379, 384 (7th Cir. 2002); *Silk v. City of Chicago*, 194 F.3d 788, 801-03 (7th Cir. 1999); *Smart*, 89 F.3d at 442. These cases, however, pre-date *Burlington Northern* and its progeny. In any event, I need not decide whether a negative performance evaluation on its own would be sufficient here because Alalade cites to more than just that to establish a materially adverse employment action.

Alalade also relies on Ncube's alleged mistreatment of her, which, alone or in combination with her negative performance evaluation, arguably would deter a reasonable employee from lodging a complaint about Ntawanda's conduct.

AWS is of course correct that oral reprimands generally are not actionable unless they materially alter the terms of employment. *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) ("unfair reprimands . . . unaccompanied by some tangible job consequence, do not

9

constitute adverse employment actions") *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001) (reprimands insufficient without "some tangible job consequence such as ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities"); *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir.1998) ("Absent some tangible job consequence accompanying [the] reprimands, we decline to broaden the definition of adverse employment action to include them.").

But the conduct Alalade alleges against Ncube is more serious, consisting not just of oral reprimands, but pervasive and severe humiliation. Such harassment-mistreatment at the hands of a co-worker can satisfy the adverse employment action element of the retaliation standard. *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 466 (7th Cir. 2002) (conditions of employment designed to harass and humiliate, if severe enough, will be considered an adverse employment action) (citing *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)); *see also Herrnreiter*, 315 F.3d at 744-45; *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996) (company may be held liable for retaliation through their acquiescence in a co-worker's campaign of retaliatory harassment); *accord Hawkins v. Anheuser-Busch, Inc.,* 517 F.3d 321, 346 (6th Cir. 2008) (same; collecting cases); *Richardson v. New York State Dep't of Corr. Servs.*, 180 F.3d 426, 446 (2d Cir. 1999) ("sufficiently severe" and "unchecked" retaliatory coworker harassment may constitute an adverse employment action) *abrogated on other grounds by Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199 (2d Cir. 2006).

Alalade contends that Ncube subjected her to daily criticism of her clothing and her figure [DE 30-1 at 22 & 29]. Ncube also routinely told Alalade that Ntawanda's sexual assault against her was Alalade's own fault, and that she would like to talk to Alalade's husband about

10

how she dresses [*Id*.]. Alalade further contends that Ncube routinely took her into the bathroom at work to berate and downgrade her, including for how she was dressed, sometimes inviting Reifel in to level the same criticisms [*Id*. at 27-28]. Alalade contends that these actions were severe enough to cause her to break down and cry at work in front of her peers [DE 33 at 12].

Keeping in mind my obligation to indulge all reasonable inferences in Alalade's favor, a jury could reasonably find that this conduct was severe enough— in conjunction with the negative performance review— to constitute actionable retaliation. In other words, it was severe enough to deter a reasonable employee standing in Alalade's shoes from complaining about Ntawanda's conduct.

**B.     Causal Connection**

To show a causal link between the protected activity of complaining about Ntawanda's conduct and Ncube's subsequent harassment, Alalade relies on circumstantial evidence, which the law permits her to do, even under the direct method. *Sylvester v. SOS Children's Vills. Ill., Inc.,* 453 F.3d 900, 902 (7th Cir. 2006). Circumstantial evidence can be any type of proof that allows for an inference of retaliation. *Id.*, at 903.

To establish a causal connection, Alalade relies in part on the temporal proximity between her complaint about Ntawanda and Ncube's subsequent harassing conduct, which Alalade says began immediately after AWS appointed Ncube as Alalade's supervisor. Suspicious timing certainly can help establish the causal link element of a retaliation claim, *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001), although standing alone it is not enough. The Seventh Circuit has held that "absent other evidence of retaliation, a temporal relation is insufficient evidence to survive summary judgment." *Contreras v. Suncast Corp.*, 237

F.3d 756, 765 (7th Cir. 2001); s*ee also Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 895 (7th Cir. 2001) (plaintiff "needs more than a coincidence of timing to create a reasonable inference of retaliation"); *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 630 (7th Cir. 2001) (same). In this case, there is evidence of both suspicious timing and more.

First, as to the timing of Ncube's harassing conduct, it appears to have started immediately after Ncube took over as Alalade's supervisor and it continued up to the June 18, 2008 negative performance appraisal [DE 33 at 12; DE 33-3 at 10; DE 30-1 at 20]. In short, the temporal proximity between the protected activity (Alalade's January 25, 2008 complaint) and Ncube's harassing conduct (beginning in February 2008) in some evidence of a causal connection between Alalade's complaint and the adverse action. Indeed, AWS does not dispute the temporal proximity between the protected activity and Ncube's conduct.

As mentioned, in addition to the suspicious timing, Alalade points to other circumstances that contribute to an inference that Ncube's conduct is causally linked to Alalade's protected activity. Specifically, Alalade argues that Ncube's relationship with Ntawanda gave her a motive for retaliating against Alalade [DE 33 at 13-14]. There is certainly evidence to support this assertion. For example, Ncube admits to knowing about the incident between Alalade and Ntawanda [DE 33-2 at 2]. And Alalade testified that she told Ncube she reported the incident to the police [DE 30-1 at 25]. Moreover, the evidence suggests that Ncube would be displeased that Alalade had reported this incident to the police. For example, Alalade has testified that Ncube was a member of Ntawanda's church [DE 30-1 at 25], where Ntawanda was a pastor [DE 30-1 at 12]. Alalade has further testified that Ncube blamed her for Ntawanda's conduct [DE 30-1 at 22]. And of course, Ncube is alleged to have started harassing Alalade at the first

12

opportunity—*i.e.*, immediately after assuming a supervisory position over Alalade.

When viewed in the light most favorable to Alalade, this additional evidence, together with the suspicious timing of the onset of Ncube's harassing conduct, creates a triable inference of causation. *Cf. Lalvani v. Cook County, Ill.*, 269 F.3d 785, 790 (7th Cir. 2001) ("When an adverse employment action follows close on the heels of protected expression, and the plaintiff can show that the person who decided to impose the adverse action knew of the protected conduct, the causation element of the *prima facie* case is typically satisfied.").

AWS, curiously, does not point to any non-retaliatory explanation for Ncube's behavior. Indeed, in its opening brief, AWS does not even address Ncube's conduct. There, AWS merely argues that no causal connection exists between Alalade's complaints and her negative performance evaluation, and that Alalade's termination was not retaliatory. And on reply, AWS reiterates its contention that Alalade's termination was not retaliatory. None of this, however, is responsive to Alalade's argument that her complaints about Ntawanda caused *Ncube's conduct*.

In sum, Alalade is entitled to have a jury resolve her retaliation claim. A jury could reasonably find that Ncube's harassing conduct culminating in a poor review was in retaliation for Alalade's complaints about Ntawanda, given the apparently close temporal proximity between those events, along with the evidence that Ncube knew about Alalade's complaint, perceived it to be an unfair attack, and believed that Alalade was ultimately responsible for Ntawanda's conduct. AWS's motion for summary judgment on that claim is therefore denied.

## II. Sexual Harassment Claim

To prevail on her sexual harassment claim, Alalade must establish that: "(1) she was subjected to unwelcome sexual advances, requests for sexual favors or other verbal or physical

conduct of a sexual nature; (2) the conduct was severe or pervasive enough to create a hostile work environment; (3) the conduct was directed at her because of her sex; and (4) there is a basis for employer liability." *Whittaker v. Northern Illinois University*, 424 F.3d 640, 645 (7th Cir. 2005) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004)).

AWS does not take issue with the first element of this claim (that Alalade was subjected to Ntawanda's unwelcome advances) or the third element (that Ntawanda's conduct was directed at Alalade because of her sex). Instead, AWS argues that Alalade cannot establish the claim's second element—that her work environment was objectively hostile—arguing that an isolated event, like Ntawanda's harassment, cannot satisfy this element. AWS further argues that, even if Alalade could establish a hostile work environment, she cannot establish the claim's fourth element, *i.e.*, a basis for employer liability.

**A.     Hostile Work Environment**

For a plaintiff to establish a hostile work environment, the alleged harassment must be "both subjectively and objectively so severe or pervasive as to alter the conditions of her employment and create an abusive working environment." *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir. 2004); *see also Quantock v. Shared Mktg. Services, Inc.*, 312 F.3d 899, 903 (7th Cir. 2002). "In determining whether the environment was objectively hostile, a court must consider all of the circumstances, including the frequency and severity of conduct, whether it is threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Wyninger*, 361 F.3d at 975-76.

Harassing conduct does not need to be severe *and* pervasive. It need only be severe *or* pervasive. *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007). In its briefing, AWS

14

fails to address this critical distinction. Because of its severity, the conduct Alalade alleges against Ntawanda is enough to support the hostile environment element of her claim, even though it occurred on just one occasion. *See e.g. Lapka v. Chertoff,* 517 F.3d 974, 984 (7th Cir. 2008) ("It is well settled that even one act of harassment will suffice if it is egregious.") (internal quotation marks and citation omitted); *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000) (same); *Smith v. Sheahan*, 189 F.3d 529, 533 (7th Cir. 1999) (district court erred in finding that sex-based harassment can never be actionable unless it is repeated).

AWS does not concede that Ntawanda's conduct was as severe as Alalade has described it. But at the summary judgment stage, I must give the benefit of the doubt to Alalade. Accepting Alalade's undisputed account of Ntawanda's conduct as true, I find that the harassment she alleges against him—including pushing her against a wall, while kissing her, grasping her breasts and genitals, and exposing his genitals—is plainly severe enough to support the hostile work environment element of Alalade's claim. Indeed, short of an actual rape, it's hard to imagine anything more severe. *Cf. Smith*, 189 F.3d at 534 (damaging the wrist of a fellow employee, such that surgery was required, because she was a woman, "easily qualifies as a severe enough isolated occurrence to alter the conditions of her employment"); *accord Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072 (10th Cir. 1998) (finding a "single incident of physically threatening conduct," in which a customer pulled his waitress by the hair, grabbed her breast, and placed his mouth on it, severe enough to create an actionable hostile work environment).

**B.     Employer Liability**

AWS, relying on the *Ellerth/Faragher* affirmative defense, argues that, even if Alalade could establish an objectively hostile work environment, she cannot satisfy the fourth element of

her sexual harassment claim—*i.e.*, AWS's liability for Ntawanda's conduct.

Where, as here, no tangible employment action has been taken by the employer against the victimized employee, an employer is entitled to assert the *Ellerth/Faragher* affirmative defense, which requires the defendant employer to show: (1) that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and (2) that the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 134 (2004) (citing *Faragher v. Boca Raton*, 524 U.S. 775, 807 (1998) and *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998)). Employers are liable for a co-worker's harassment only "when they have been negligent either in discovering or remedying the harassment." *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 952 (7th Cir. 2005) (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir.1997)). An employer satisfies its legal duty in coworker harassment cases "if it takes reasonable steps to discover and rectify acts of . . . harassment of its employees." *Id.* (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) (internal quotation marks omitted)).

AWS argues that it satisfies the first "reasonable care" element of this defense because it (a) has a written policy against sexual harassment, and (b) promptly investigated Alalade's complaint. I agree. Alalade does not dispute the existence of AWS's anti-harassment policy. And this policy certainly helps to show that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior. *See Shaw v. AutoZone, Inc.*, 180 F.3d 806, 811 (7th Cir. 1999) ("the existence of an appropriate anti-harassment policy will often satisfy this first prong"). Still, the mere existence of the policy is not enough to establish the first prong of the

16

*Ellerth/Faragher* defense. *Cerros*, 398 F.3d at 953.

AWS, however, cites to additional facts that show the reasonableness of its response to the incident. Most importantly, undisputed evidence exists that AWS acted promptly in response to learning about Ntawanda's conduct. Alalade herself testified that AWS personnel, Kim Bolen and Jill Rosenberg, interviewed her after she had submitted her January 25, 2008 written formal complaint about the incident [DE 30-1 at 15-16]. And she does not contest AWS's assertion that the investigation of the incident occurred promptly after Alalade reported it. She further testified that, two days after the interview with Bolen and Rosenberg, another AWS employee, Eric Weeks, contacted her as part of AWS's investigation into the incident [DE 30-1 at 18-19]. And Ntawanda was later terminated for the incident [DE 30-2 at 2-3].

Of course, in evaluating the reasonableness of AWS's response, I must consider the gravity of the alleged harassment. *Cooper-Schut v. Visteon Auto. Sys.*, 361 F.3d 421, 426 (7th Cir. 2004). And the harassment here was clearly severe. However, the foregoing uncontested evidence of AWS's investigation, culminating in Ntawanda's termination, shows that AWS's response in this case, including the termination of Ntawanda, was reasonable and prompt. *See Cerros*, 398 F.3d at 954 ("prompt investigation of the alleged misconduct" is "a hallmark of reasonable corrective action"); *see also Lapka,* 517 F.3d at 984 ("efficacy of an employer's remedial action" is "material" to "inquiry into the reasonableness of the response").

The problem for AWS is it fails to satisfy the second element of the *Ellerth/Faragher* defense—the requirement that it show that Alalade unreasonably failed to take advantage of any preventive or corrective opportunities. "[T]he purpose of this requirement is tied to Title VII's primary objective, which is not meant to provide redress but rather to avoid harm." *Gawley v.*

17

*Indiana University,* 276 F.3d 301, 312 (7th Cir. 2001) (citing *Faragher*, 524 U.S. at 806-07); *see also Cerros*, 398 F.3d at 952. Thus, for employers who implement reasonable procedures designed to prevent harassment, "there will be no liability if employees fail to take advantage of the procedures." *Id.*

In the usual case, this element of the defense is satisfied where an employee simply fails to complain about a harasser's conduct at all, *see Shaw*, 180 F.3d at 813 (plaintiff failed to reasonably avail herself of the employer's anti-harassment policies when she never complained about the harasser's behavior), or where the plaintiff delays reporting for a period of several months, *see Roby v. CWI, Inc.*, 579 F.3d 779, 786 (7th Cir.2009) (five months); *Jackson v. County of Racine*, 474 F.3d 493, 501 (7th Cir. 2007) (four months); *Gawley*, 276 F.3d at 312 (seven months).

That is not what occurred here; Alalade submitted a written complaint just four days after the incident. A jury could readily conclude that Alalade acted reasonably in waiting just a few days before reporting the incident.

Given that a dispute of fact exists as to the hostile work environment element of Alalade's claim, AWS's failure to establish the *Ellerth/Faragher* defense means that Alalade is entitled to have a jury decide her sexual harassment claim. So AWS's motion for summary

judgment as to that claim is denied.[2]

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** defendant AWS's motion for summary judgment [DE 30] as to plaintiff Annastacia Alalade's sexual harassment claim under Title VII and her Title VII retaliation claim.

**SO ORDERED**.

ENTERED: May 18, 2011

                                                        s/ Philip P. Simon
                                                        PHILIP P. SIMON, CHIEF JUDGE
                                                        UNITED STATES DISTRICT COURT

---

[2]Because I am denying summary judgment on this basis, I need not resolve Alalade's strained argument that AWS cannot avoid liability because Ntawanda is AWS's alter-ego, or proxy. But I note that this argument is almost certainly a non-starter. It is true that an employer is not able to avoid liability if the offending employee is "within that class of an employer organization's officials who may be treated as the organization's proxy." *Johnson v. West*, 218 F.3d 725, 730 (7th Cir. 2000) (citing *Faragher*, 524 U.S. at 789). The following officials may be considered an employer's proxy: "a president, owner, proprietor, partner, corporate officer or supervisor 'hold[ing] a sufficiently high position in the management hierarchy of the company for his actions to be imputed automatically to the employer.'" *Johnson*, 218 F.3d at 730 (quoting *Faragher*, 524 U.S. at 789-90). Ntawanda did not speak for AWS, nor does he appear to have been in a "significantly high position" within the company. To hold otherwise would be to render the *Ellerth/Faragher* defense virtually useless in cases of low level supervisor harassment.